# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| CARL TATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 08-cv-5664 |
| | ) | |
| TERRY MCCANN, et al., | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Carl Tate ("Tate"), filed this civil rights lawsuit on October 3, 2008, and subsequently filed an amended complaint [1, 48]. Before the Court is a motion to dismiss that amended complaint [58], filed by Roger E. Walker ("Walker"), Terry McCann ("McCann"), Karen Rabideau ("Rabideau"), Ronald Meek ("Meek"), and Venita Wright ("Wright") (collectively "Defendants," although the amended complaint names other defendants who are not parties to the instant motion). Defendants contend (i) that as to Tate's federal civil rights claims, the complaint does not sufficiently allege the personal involvement of Defendants in bringing about Tate's constitutional deprivations and (ii) that if the Court dismisses the federal civil rights claims, then the single state law claim should be dismissed as well. The Court has federal question subject-matter jurisdiction over the federal civil rights claims (28 U.S.C. § 1331; *id.* § 1343(a)(3)) and supplemental jurisdiction over the Illinois state law claim (28 U.S.C. § 1367(a)).

For the reasons set forth below, Defendants' motion to dismiss [58] is denied.

**I. Background**

According to Tate, whose well-pleaded factual allegations the Court accepts as true at the motion to dismiss phase (*Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005)), Tate is an inmate housed at the Pinckneyville Correctional Center. Tate was housed at the Stateville Correctional Center ("Stateville") during the events giving rise to this lawsuit. Compl. ¶ 5.[1] McCann was the Warden of Stateville. *Id.* ¶ 6. Walker was the Director of the Illinois Department of Corrections. *Id.* ¶ 7. Meek was the Deputy Director of District 4 of the Illinois Department of Corrections. *Id.* ¶ 8. Rabideau was a placement officer at Stateville who approved all of Tate's cell assignments. *Id.* ¶ 12. Wright was the Acting Health Care Administrator at Stateville. *Id.* ¶ 14. Four other defendants are named in the complaint but are not parties to the instant motion to dismiss: Dr. Ghosh was one of the treating physicians at Stateville. *Id.* ¶ 13. Officer Leslie Turner, Sergeant Baldwin, and Lieutenant Buczkowski were officers at Stateville. *Id.* ¶¶ 9-11.

For a time at least, Tate was a member of a gang called the "Conservative Vice Lords" (the "CVL gang"). But in 1998, Tate was convicted of killing another CVL gang member—a member who outranked Tate. The result was an immediate death sentence that could be carried out by any member of the CVL gang, in addition to the punishment doled out by Illinois' criminal justice system. Compl. ¶ 21. The Illinois Department of Corrections was aware of the threat: Tate's file shows that he was "flagged" by Internal Affairs as someone who should not be housed with members of the CVL gang. *Id.* ¶ 22. And in 2003, Tate was moved to a different facility because of the threat posed by CVL gang members housed at Stateville. *Id.* ¶ 23.

But in 2006, the Illinois Department of Corrections sent Tate back to Stateville, a move which provoked a nearly immediate request by Tate (to Walker, the Illinois Department of Corrections Director) to be sent to another facility. Compl. ¶¶ 24-25. Tate told Walker that his

---
[1] Citations to Plaintiff's First Amended Complaint [48] are given in the format "Compl. ¶ __."

life would be in danger unless he was moved to a different facility, but Walker did not respond. *Id.* ¶ 25.

According to Tate, officials did more than merely not respond. Tate says that although "he was supposed to be in protective custody," he instead was placed in the general population where there were many members of the CVL gang. Compl. ¶ 28. And in October 2006, Tate was assigned to share a cell with a CVL gang member, Toussaint Daniels. Tate responded immediately by informing Sergeant Baldwin and Lieutenant Buczkowski (again, neither one is a party to the motion to dismiss) that Tate was classified as being in protective custody and that Toussaint Daniels had threatened him. The officers told Tate that he should "stop snitching" and learn how to fight. *Id.* ¶¶ 30-31.

On roughly October 11, 2006, "just as he warned various prison officials" of the danger to his safety by writing emergency grievances and letters in an attempt to be moved away from Toussaint Daniels, Tate was assaulted by Daniels and suffered "several serious physical injuries." Compl. ¶¶ 32-33. After that encounter, Tate was assigned a new cellmate, Matthew Foley, an Aryan Brotherhood gang member. *Id.* ¶¶ 34, 40, 53. (The assignment was made even though Tate is African-American. See *id.* ¶ 5.) In late November and into December 2006, Tate filed grievances and also informed Sergeant Buczkowski that Matthew Foley was threatening him; the latter's response (again) was to tell Tate that Tate should stop snitching and "should fight like a man." *Id.* ¶¶ 37-38. Also in December, Tate wrote to Walker, renewing his request for a transfer or to be put in a protected cell—the letter said that Matthew Foley was threatening his life and that the officers at the facility (Turner, Baldwin, and Buczkowski) were ignoring the danger and refusing to help him. *Id.* ¶ 39.

3

On December 27, 2006, Tate spoke to Turner, an officer with Internal Affairs, again warning of the risk that Matthew Foley posed and elucidating the reasons for his concerns, including that Foley's fellow Aryan Brotherhood gang members were yelling through the gallery that Foley should kill him. Tate was told not only to "stop being a coward," he was told to stop complaining, and Turner took no steps to investigate the danger posed by Foley. Compl. ¶¶ 40-43. That same day, Tate was brutally assaulted by Matthew Foley. During the assault, Tate was knocked unconscious and had his property stolen. *Id.* ¶ 44. Foley subsequently admitted during an interview that he had assaulted Tate. *Id.* ¶ 45-46. Although Foley was moved out of the cell, Turner refused to document evidence of Tate's injuries. Tate filed another grievance after this series of events occurred (the complaint does not say whether the grievance related to the attack by Foley, the response by Turner, or both). *Id.* ¶¶ 47-79.

January 2007 found Tate writing to Meek for help. Meek was the Deputy Director of the Illinois Department of Corrections. Tate's effort to get into protective custody had been granted, but Tate was placed into a protective custody cell with another Aryan Brotherhood gang member. Compl. ¶¶ 50-53. This other gang member, John Malinowski, was widely known as both a member of the Aryan Brotherhood and as a close friend of Matthew Foley. *Id.* ¶¶ 53-54. The same day that Tate was placed with Malinowski, Tate was assaulted by Malinowski. This led Tate to file another grievance, and no effort was made to separate Tate and Malinowski while the grievance was investigated. Apparently as part of that investigation, Malinowski met with Officer Turner. Malinowski requested a one-man cell and told Turner that he (Malinowski) would "beat, rape, or otherwise harm Plaintiff Tate or anyone else housed with him until he was celled alone." *Id.* ¶ 55-57. Malinowski repeated the threat to other officers. *Id.* ¶ 58. Still, Malinowski and Tate were not separated and Tate—seemingly falsely, although the complaint is

4

not entirely clear—reported to prison officials that Malinowski made good on his threat and raped Tate. *Id.* ¶¶ 59-60. Turner still refused to move Malinowski. *Id.* ¶¶ 61-62. What is more, Turner, irked by Tate's grievances and letters to the governor, told Tate that he would "personally fight to have Mr. Tate's further requests for protective custody and transfer 'shut down.'" *Id.* ¶ 63.

Tate also alleges that he was denied medical care during the time period in which the assaults took place. After he was assaulted by Toussaint Daniels in October 2006, Tate filed a request to see the prison doctor for treatment of his injuries. Although Tate filed multiple such requests, he received no response (and no examination) during October, November, and December 2006. Tate was not examined until more than a week after the Foley assault in January 2007. Compl. ¶¶ 65-75. Dr. Ghosh, the Stateville Medical Director and a named defendant who is not a party to the instant motion to dismiss, was aware of Tate's requests for medical treatment but ignored the requests. *Id.* ¶ 89. Vanessa Wright, the Acting Health Care Administrator who also received word that Tate's injuries were left untreated, also ignored Tate's requests for medical attention. *Id.*

Tate's complaint comprises nine counts, the first five of which allege Eighth Amendment violations. Count I names McCann, Baldwin, Buczkowski, Walker, and Rabideau. Count I alleges that Rabideau acted with deliberate indifference when she placed Tate into the cell with Toussaint Daniels, the CVL gang member, and that Walker and the other named Defendants acted with deliberate indifference in ignoring Tate's "repeated entreaties" to address the assignment. Counts II and III name the same Defendants and make essentially the same allegations with respect to Matthew Foley and John Malinowski. Count IV names Wright and Ghosh, the latter of whom is not a party to the instant motion to dismiss, and alleges that the two

were deliberately indifferent to Tate's medical needs when they ignored his requests for medical assistance. Count V names McCann and Walker and alleges that their assignment policies placed Tate and "certain [other] protective-custody inmates * * * in unreasonably dangerous conditions" because the policy placed protective-custody inmates in the general prison population. The dangerous conditions "caused [Tate] to forgo his constitutionally protected right to basic human needs, and to suffer emotional distress." Count VI alleges that McCann, Turner, Baldwin, Buczkowski, and Walker violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution when they failed to respond to multiple requests for assistances and to Tate's grievances. Count VII names only Turner, and alleges that Turner violated Tate's First Amendment rights when he acted to thwart Tate's complaints and when he "foment[ed] discord between [Tate] and the [CVL gang]." Count VIII is essentially identical to Count VII and attempts to invoke a slightly different legal theory. Count IX names all Defendants and alleges that their actions constitute willful and wanton negligence under Illinois state law.

## II.  Legal Standard

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. See *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In analyzing a motion to dismiss, the factual universe generally is defined by the Plaintiff's complaint: the Court accepts as true all of the well-pleaded facts alleged by the Plaintiff and all reasonable inference that can be drawn therefrom. See *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005).

To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to

relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Svcs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563. The pleading principles that *Twombly* clarified, like the Federal Rules of Civil Procedure in general, apply "in all civil actions." Fed. R. Civ. P. 1; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1953 (2009).

**III.    Analysis**

Defendants' motion argues (i) that all of the federal civil rights claims against McCann, Walker, Rabideau, Meek, and Wright must be dismissed because Plaintiff has failed sufficiently to allege the personal involvement of each of these Defendants in bringing about the violation of Tate's rights, and (ii) that the dismissal of the federal claims should lead the Court to exercise the strong presumption in favor of dismissing the single state law claim in Count IX. Because Defendants' constitutional arguments fail, their effort to have the state law claim dismissed is denied as moot.

   **A.    Eighth Amendment**

First, the Court addresses the federal civil rights claims related to the alleged Eighth Amendment violations (Counts I to V). The crux of Defendants' attack is this: "Plaintiff does not make any specific, fact based allegations that indicate that each of the aforementioned

7

Defendants had specific knowledge of the threats [to Tate] and were deliberately indifferent."[2] Def. Mot. at 5. If correct, the omission would be fatal because, as Defendants correctly observe, Section 1983 does not allow recovery on a *respondeat superior* theory of liability. See *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001).

Liability is not easily imposed on prison officials based on a deliberate indifference theory. When it comes to prison officers who place an inmate in harm's way, liability may be imposed only if the exposure was "gratuitous." *Riccardo v. Rausch*, 375 F.3d 521, 525 (7th Cir. 2004) (acknowledging that "prisons are dangerous places" and that many inmates "get there by violent acts"). Nonetheless, when officials are deliberately indifferent to a substantial risk of serious harm that is posed by fellow inmates, liability may be imposed on the officials who place an inmate—or allow him to remain—in a dangerous environment. *Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *Rausch*, 375 F.3d at 526 (same). "Once prison official know about a serious risk of harm, they have an obligation 'to take reasonable measures to abate it.'" *Dale*, 548 F.3d at 569 (quoting *Borello v. Allison*, 446 F.3d 742, 747 (7th Cir. 2006)). If the official does take reasonable steps to abate a substantial risk of serious harm, then liability will not be imposed even if, in hindsight, more could have been done. *Farmer*, 511 U.S. at 844-45; *Palmer v. Marion County*, 327 F.3d 588, 593 (7th Cir. 2003) (mere possibility in hindsight of better responses is insufficient to establish deliberate indifference). Likewise, if the inmate is not sufficiently clear to prison officials about the nature of the harm that he faces, it is more likely that liability will not attach to the actions of officials

---

[2] As to Count V specifically, which alleges that McCann and Walker formulated a deliberately indifferent policy, little need be said. The Court does not perceive the (unexpressed) defect that motivates Defendants' motion to dismiss. The personal involvement is that McCann and Walker formulated the allegedly unconstitutional policy at issue, and that Tate was injured thereby. See, *e.g.*, *Armstrong v. Squadrito*, 152 F.3d 564, 581 (7th Cir. 1998). No more need be said about Defendants' undeveloped argument; the motion to dismiss Count V is denied.

who do not take corrective action. See, *e.g.*, *Dale*, 548 F.3d at 570 (refusing to create a "constitutional Catch 22").

Although Defendants have not provided individuated analysis with respect to each Defendant and explained what they found lacking in the allegations, the Court's reading of the complaint is that Tate alleges precisely that which Defendants say is missing—namely, "specific, fact based allegations that indicate that each of the [named] Defendants had specific knowledge of the threats [to Tate] and were deliberately indifferent." Def. Mot. at 5.

### 1. Walker

The complaint states that Walker was the Director of the Illinois Department of Corrections. Compl. ¶ 7. Tate alleges that he made Walker aware on numerous occasions that housing Tate at Stateville was unsafe based on Tate's CVL gang affiliation and that the warnings were ignored. *Id.* ¶¶ 25-26. In addition to writing to Walker immediately after his 2006 arrival at Stateville, Tate wrote to Walker after the Toussaint Daniels attack and before the Matthew Foley attack to tell Walker that he remained in danger and that officials at the facility were doing nothing to address his concerns. See Compl. ¶ 39. Later in the complaint, Tate alleges that "Roger E. Walker acted with deliberate indifference to the substantial risk of serious harm posed to Plaintiff Tate by his cellmate and gang member Toussaint Daniels by ignoring Plaintiff Tate's repeated entreaties, in verbal and written form, to remove him from his dangerous situation." *Id.* ¶ 78. Specifically, the complaint says that Tate told Walker about the standing order within the CVL gang to kill Tate and that Toussaint Daniels was a member of the CVL gang, as well as the fact that Tate was supposed to be in protective custody (but was not being housed consistent with his status). *Id.* Similarly, the complaint alleges that Walker was made aware that Matthew Foley threatened Tate, that Foley was in a white supremacist gang, and that Foley had a past history of

9

violence against inmates. *Id.* ¶ 83. And the complaint makes virtually the same arguments with respect to Tate's placement with John Malinowski. *Id.* ¶ 86. What is more, Tate does in fact specifically allege that Walker disregarded Tate's pleas. See, *e.g.*, *id.* ¶ 79. Ignoring repeated warnings can help to support "an inference that [a defendant] knew of a serious risk." *Squadrito*, 152 F.3d at 580. Walker's senior position in the corrections hierarchy does not alter the analysis. *Cf. Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006) (Director of Illinois Department of Corrections could have been found liable on Eighth Amendment theory had there been "record evidence that because of the purported letters [from the inmate], [the director] knew of a constitutional deprivation and approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated").

### 2. McCann

The allegations in the complaint related to McCann are essentially the same as the allegations related to Walker. The complaint says that McCann was the warden at Stateville. Compl. ¶ 6. Tate's complaint names McCann using the shorthand "Stateville Officials." See *id.* at 1. In pertinent part, the complaint says that Tate complained to McCann about Toussaint Daniels and informed McCann about the standing kill order from the CVL gang (*id.* ¶ 78), as well as the threats by Matthew Foley (*id.* ¶ 82) and by John Malinowski (*id.* ¶ 86). The complaint also states that Tate's pleas were disregarded. *Id.* ¶¶ 79, 83, 87. As with Walker, the allegations sufficiently plead an Eighth Amendment violation.

### 3. Rabideau

The complaint says that Rabideau bore the title "Placement Assignment Officer" and that she approved all of Tate's cell assignments, including the assignments to share cells with the three assailants who beat Tate. Compl. ¶ 12. The complaint also states that Rabideau knew of

the risks associated with the CVL gang, information which was in Tate's file and which was supposed to be taken into consideration in Tate's cell assignments (*id.* ¶¶ 22, 77); as well as the risks associated with Matthew Foley, who was known to be in a white-power gang (*id.* ¶ 81); and the risks associated with John Malinowki, who was known to be in the same gang as Foley (*id.* ¶ 86). Despite knowing of the risks, she assigned Tate to share cells with the eventual assailants. *Id.* ¶¶ 79, 83, 87. And of course, if she was aware of the subsequent assaults, which is a plausible assumption at this stage of the litigation, then there was mounting evidence of danger, which means that it is more likely that Rabideau's actions *could be* (we do not know, as there has been no factual development) adjudged unreasonable, taking her out of *Farmer v. Brennan*'s safe harbor. See, *e.g.*, *Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001).

### 4. Meek

The complaint states that Meek was the Deputy Director of District 4 of the Illinois Department of Corrections. Compl. ¶ 8. Tate alleges that he wrote to Meek on January 10, 2007, after he was assaulted by Foley. *Id.* ¶ 50. Tate alleges that Meek was deliberately indifferent to (*i.e.*, he was subjectively aware of an objectively serious risk) the risk that John Malinowski posed to Tate. *Id.* ¶ 86. Although the allegations relate only to complaints that occurred after the Foley assault, Defendants have not elucidated why a single complaint to an official is insufficient as a matter of law. If that is Defendants' argument, then *Farmer* itself forecloses it. 511 U.S. at 848 ("[T]he failure [by the inmate] to give advance notice is not dispositive."). The deliberate indifference standard is focused on the nature and quality of the risk, what the official actor knew, and what the official actor did. *Cf.*, *e.g.*, *Rausch*, 375 F.3d at 525 (discussing the difficulties associated with discriminating "between serious risks of harm and feigned or imagined ones").

5. **Wright**

The complaint alleges that Venita Wright was the acting Stateville Health Care Administrator. Compl. ¶ 14. Further, the complaint alleges that Wright received, and was responsible for acting on, all requests for medical care that were submitted to the medical unit. *Id.* Finally, the complaint alleges that Wright knew that Tate was seriously injured but did nothing for three months after the assault by Daniels and for more than a week after the assault by Matthew Foley. See *id.* ¶ 1, 65, 68, 72, 89, 90. Defendants have presented no argument specific to Wright about why these allegations are legally insufficient, and given the legal framework and analysis sketched out above, the Court declines to speculate as to what Defendants find lacking.

B. **Fourteenth Amendment Procedural Due Process**

Tate's complaint also alleges that Stateville Officials discouraged Tate from using the prison grievance procedures, failed to respond to grievances, and failed to document Tate's injuries pursuant to Illinois state law. Compl. ¶¶ 96-98. According to Tate, "[t]hese actions and inactions * * * constitute denial of *procedural* due process." *Id.* ¶ 99 (emphasis added).

Defendants' motion to dismiss urges, and Tate concedes, that "[a] state inmate's grievance procedures do not give rise to a liberty interest protected by the due process clause." Def. Mot. at 4 (citing *Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1995)); see also Pl. Mem. at 8; *Muast v. Headley*, 959 F.2d 644, 648 (7th Cir. 1992) ("[T]he law is well-settled that state-created procedural rights do not, standing alone, constitute protected liberty interests."). But that just means that failing to hew to grievance procedures does not itself sound in *substantive* due process. Still, and as Tate recognizes (Pl. Mem. at 9), in order to prevail on a procedural due process theory, a plaintiff ultimately must show that there is an underlying liberty

or property interest; state law, for example, may furnish the predicate interest. See, *e.g.*, *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) ("[A]n individual claiming a protected interest must have a legitimate claim of entitlement to it. Protected liberty interests 'may arise from two sources—the Due Process clause itself and the laws of the States."); *id.* at 461-62 (stating, in the context of prisons specifically, that state law may create a protectable liberty interest). Of course, the issue of whether Tate has an underlying liberty interest, sometimes referred to as a "substantive predicate," has not properly been presented to the Court, although the case law suggests that Tate may have a difficult time with the argument and that it may not be worth the effort given the seeming viability of the Eighth Amendment claims. See, *e.g.*, *Wilkinson v. Austin*, 545 U.S. 209, 221-24 (2005) (emphasizing, among other things, that a plaintiff must establish a "baseline" hardship of prison life and then establish that the hardship created by the defendants "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life"); *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Shvartsman v. Apfel*, 138 F.3d 1196, 1200 (7th Cir. 1998). In any event, the Court declines to take up the issue *sua sponte*. Accordingly, Defendants' motion to dismiss Count VI is denied.

**IV.    Conclusion**

For the foregoing reasons, the Defendants' motion to dismiss [58] is denied.

Dated:  January 26, 2010

_____
Robert M. Dow, Jr.
United States District Judge